1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        slitteral@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

YERALDINNE SOLIS, on behalf of
herself and all others similarly situated,

                    Plaintiff,

        v.

COVERGIRL COSMETICS and
COTY, INC.

                    Defendants.

Case No.   **'22 CV 0400 BEN NLS**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Yeraldinne Solis ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants CoverGirl Cosmetics and Coty, Inc., (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiff brings this class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased for personal, family or household use Defendants' TruBlend Pressed Powder (the "Product"), which is unfit for its intended use because it contains unsafe per- and polyfluoroalkyl substances ("PFAS").[1]   The Product is formulated, designed, manufactured, advertised, distributed, and sold by Defendants or their agents to consumers, including Plaintiff, across the United States, including in California.

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[2]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased

---

[1] Discovery may reveal that additional CoverGirl products are within the scope of this Complaint. Accordingly, Plaintiff reserve the right to include additional cosmetic items identified through the course of discovery.

[2] Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol*. 2022, 56, 1162-1173, 1162.

fertility, and increased risk of asthma and thyroid disease."[3]

4.     Despite Defendants' representations to consumers that their products are "sustainable"[4] and "safe,"[5] independent research conducted by Toxin Free USA determined that the Product contains **6,242 parts per million (ppm) of fluorine**, and that "[s]ubsequent testing revealed that all 6,242 ppm of the fluorine detected was organic fluorine; organic fluorine results identify a quantity of organofluorine compounds (*e.g.*, PFAS) and excludes the possibility that fluorine may be present from other or natural sources."[6]

5.     As a point of reference, the current EPA health advisory limit for safe consumption, is just **70 nanograms per liter**.[7]  To put this in perspective, **1 part per million is the equivalent of 1,000,000 nanograms per liter**.[8]  Accordingly, use of the Product would expose a consumer to PFAS at levels that are several orders of magnitude higher than one would receive from drinking a liter of water that contains PFAS at the level considered safe by the EPA.

6.     This is particularly worrisome in the context of Defendants' packaging, which encourages consumers to "apply throughout the day;" that it is "suitable for sensitive skin" and is "dermatologically tested,"[9] each of which serves to assure the

---

[3] Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Mar. 22, 2022).

[4] *See, e.g.*, https://www.covergirl.com/en_us/cruelty-free-makeup.html.

[5] *See, e.g.*, https://www.coty.com/sites/default/files/coty_sustainability_report_fy20.pdf at 31.

[6] *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CA-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.

[7] Duke University, Nicholas School of the Environment, "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," Jan. 5, 2022, https://nicholas.duke.edu/news/high-levels-pfas-found-anti-fogging-sprays-and-cloths (last accessed Mar. 22, 2022).

[8] JustinTOOLS, "Density Units Conversion parts-per-million to nanograms-per-liter," https://www.justintools.com/unit-conversion/density.php?k1=parts-per-million&k2=nanograms-per-milliliter (last accessed Mar. 23, 2022).

[9] See, e.g., https://www.amazon.com/COVERGIRL-truBlend-Blendable-Translucent-packaging/dp/B01N23W63D/ref=sr_1_6?crid=TZB6QAGC5PA5&keywords=trublend+pressed+p

---

consumer that the Product is indeed safe for use as advertised.

7.      Even more disconcerting, Defendants' advertising shows the Product employed directly on the face as set out below, despite research that shows that exposure near the eyes and mouth increases the likelihood and hence risk of absorption and ingestion.[10]



**SILKY SMOOTH FORMULA**
Special skin-brightening pigments help
minimize the appearance of imperfections

8.      Defendants also link consumers to like products to show how to properly apply the Product on the face, including in the areas directly near the eyes, as shown in the photograph below.



owder&qid=1648150206&rdc=1&sprefix=trublend+pressed+powder%2Caps%2C122&sr=8-6 (last accessed

[10] Heather D. Whitehead et al., "Fluorinated Compounds in North American Cosmetics," *Env't Sci & Tech*. 2021, 8, 7, 538-44 (June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240 (last accessed Mar. 22, 2022).

9.      Thus, based on Defendants' representations, a reasonable consumer would expect that the Product can be safely used as marketed and sold.  However, the Product is not safe, posing a significant health risk to unsuspecting consumers.  Yet, neither before nor at the time of purchase do Defendants notify consumers like Plaintiff that their Product is unsafe, contains heightened levels of PFAS, or should otherwise be used with caution.

10.     Accordingly, Plaintiff brings her claims against Defendants individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (3) breach of Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had and Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; (14) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*; and (15) Negligent Failure to Warn.

## **PARTIES**

11.     Plaintiff Yeraldinne Solis is a natural person and a citizen of California who resides in Escondido, California.  In approximately December of 2021, Ms. Solis purchased Defendants' Product from a Target retail store located in Escondido.  Prior to her purchase, Ms. Solis reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including that the Product was safe and sustainable.  Ms. Solis understood that based on Defendants' claims, the Product was safe for use and, otherwise a sustainable product.  Ms. Solis reasonably relied on these representations and warranties in deciding to purchase the Product, and these

representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.  As a direct result of Defendants' material misrepresentations and omissions, Ms. Solis suffered and continues to suffer, economic injuries.  Ms. Solis remains interested in purchasing from Defendants in the future and hopes she can rely on Defendants' marketing when doing so.

12.    Defendant CoverGirl Cosmetics is a foreign corporation with its principal place of business located in Cockeysville, Maryland, 21030.  Defendant CoverGirl is owned by Coty, Inc.

13.    Defendant Coty, Inc. is a foreign corporation with its principal place of business located in New York, New York.  Defendant Coty is the owner of CoverGirl Cosmetics.

## FACTUAL ALLEGATIONS

### A.    Beauty Products And Consumer Preferences

14.    According to Power Reviews—an organization that provides market analytics to cosmetic companies such as Ulta Beauty and Estee Lauder—76 percent of the more than 10,000 "beauty consumers" surveyed, are focused "on buying products that are sustainably made."[11]

15.    At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "[w]hen asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[12]  Significantly, "[t]hese

---

[11] Power Reviews, "The Changing Face of the Beauty Shopper," https://www.powerreviews.com/insights/2021-beauty-industry-consumer-report/ (last accessed Mar. 23, 2022).

[12] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

factors won out over convenience, country of origin, environmental impact, product performance, price and social / human rights / labor impact."[13]

16.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more and 17% willing to spend 1-5% more."[14]

17.    For these reasons, several companies, including Defendant, have expanded their marketing efforts to attract consumers into purchasing cosmetics branded as safe and sustainable.  Indeed, "the clean beauty market is estimated to reach $22 billion by 2024," according to Statista Research.[15]

18.    Thus, there is enormous incentive for companies such as Defendants to market their products as safe and sustainable.  Indeed, Defendants have repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors even when—as demonstrated below in the context of the Product's packaging—Defendants are short on words.  Examples of these representations are included below.

19.    These include statements made directly on Defendants' websites such as "at COVERGIRL, we hold ourselves to the highest quality standards when it comes to the safety and efficacy of our products."[16]

20.    Defendants state that they are "championing open, inclusive and *sustainable* beauty." (emphasis added).[17]

---

[13] *Id.* at 3.

[14] *Id.*

[15] Kristin Larson, "Shopper Demand For Clean Beauty And Increased Transparency Continues," *Forbes* (Jun. 30, 2021), https://www.forbes.com/sites/kristinlarson/2021/06/30/shopper-demand-for-clean-beauty-and-increased-transparency-continues/?sh=75f3d8e05402 (last accessed Mar. 23, 2022).

[16] CoverGirl, "FAQs," https://www.covergirl.com/en_us/cruelty-free-makeup.html (last accessed Mar. 23, 2022).

[17] *Id.*

21.     Defendants state that they "use[] a wide array of validated alternative methods to assess and ensure [their] products remain safe" and that they "continue to invest in the latest alternative testing technology and innovation to ensure [they] are delivering safe, high-quality products."[18]

22.     Defendants state that they are "changing the way [they] design, formulate and manufacture, in order to minimize [their] environmental impact and create more innovative, cleaner products" and that "[b]y working hand-in-hand with [their] ingredients suppliers, [they] use the latest innovation and technology, applying green science to minimize the pressure of our products on natural resources."[19]

23.     Defendants state that their "products have an important role to playing in building a sustainable future" and that "sustainability is at the heart of [their] product creation, from design and development through to procurement of materials."[20]

24.     Defendants state that they "constantly strive to develop products that reflect [their] consumers' evolving needs.  Increasingly, this means clean products that meet consumer demand for ingredient transparency and minimalist safe formulas, that don't compromise on product quality."[21]

25.     Significantly, this ethos which Defendants have amplified as a part of their rebranding effort beginning in October 2021, extends to their packaging.  As one marketing organization that has studied Defendants' marketing shift writes:

> When it comes to beauty, in particular, there seems to be a push for natural, organic, and healthy products.  People don't just care about makeup that transforms, but makeup that heals, makeup that soothes, and makeup that promotes a health and vivaciousness that most of our middle school selves couldn't have cared less about.  As a result, brands are focusing more on giving makeup that has benefits for

---

[18] *Id.*

[19] Coty Inc., "Beauty of Our Product," https://www.coty.com/sustainability/beauty-of-our-product (last accessed Mar. 23, 2022).

[20] *Id.*

[21] *Id.*

your skin – makeup that is clean and fresh – which they mimic in their packaging.[22]

26.     The experts continue "CoverGirl's new packaging is sleek, clean, and encourages consumers to focus on the message behind the design . . . . It's clean and sleek look emphasizes its natural ingredients and the brand's dedication towards openness and positivity."[23]



27.     And Defendants recognized this in their recent report to investors: "In the U.S., CoverGirl continues to show that the brand is on a sustainable path of improvement and growth as it has grown and maintained share in 6 of the last 9 months since the new brand equity was launched."[24]

28.     However, as described in the next section, Defendants' Product is not safe

---

[22] Design Rush, "CoverGirl Rebranding: New Makeup, New CoverGirls & A New Minimalist Design," (Jan. 5, 2022), https://www.designrush.com/agency/logo-branding/trends/covergirl-rebranding.

[23] *Id.*

[24] Coty Reports Strong 2Q22 Across All Metrics, With Significant Momentum Into 3Q22, https://s23.q4cdn.com/980953510/files/doc_financials/2022/q2/Earnings-Release-Q2FY22-FINAL.pdf (last accessed Mar. 23, 2022).

for use, and poses a critical risk to the safety and health of consumers.

**B.    PFAS In Cosmetic Products Are Harmful To Humans And The Environment**

29.     Toxin Free USA's study followed the groundbreaking research conducted at the University of Notre Dame and later published in the *Environmental Science & Technology Letters* in June 2021.  This research, entitled "Fluorinated Compounds in North American Cosmetics," sought to assess the potential health and environmental risk of PFAS in cosmetics, analyzing more than 231 cosmetic products purchased in the United States and Canada.[25]

30.     The researchers explained that "PFAS are used in cosmetics due to their properties such as hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability."[26]

31.     The Food and Drug Administration ("FDA") has also recognized this noting that PFAS are often "intentionally added" to certain products such as "foundation, lipstick, eyeliner, eyeshadow, and mascara."[27]

32.     But PFAS are not necessary for the intended outcomes.   Indeed, numerous of Defendants' competitors' products have been tested by researchers and found to contain no detectable levels of organic fluorine.[28]  Accordingly, Defendants would have had knowledge that they could produce the Product without the heightened level of PFAS inherent in its current composition.  Yet, Defendants chose not to, and instead concealed this information from consumers.

---

[25] Heather D. Whitehead, et al. "Flourinated Compounds in North American Cosmetics," *Environ. Sci. Technol. Lett*. 2021, 8, 538-544.

[26] *Id.* at 538.

[27] Sandee LaMotte, "Makeup may contain potentially toxic chemicals called PFAS, study finds," *CNN* (June 15, 2021), https://www.cnn.com/2021/06/15/health/makeup-toxic-chemicals-wellness/index.html (last accessed Mar. 24, 2022).

[28] Leah Segedie, "CoverGirl Makeup Sued For PFAS 'Forever Chemicals' & False Advertising," *Mamavation* (Dec. 28, 2021), https://www.mamavation.com/beauty/covergirl-makeup-sued-for-pfas.html (last accessed Mar. 24, 2022).

---

33.    All PFAS contained carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.[29]

34.    There are multiple avenues through which PFAS can invade the body, including through ingestion, inhalation, and skin absorption.[30]

35.    A figure utilized by the researchers at Notre Dame demonstrates how PFAS in cosmetics may be introduced into the human body:[31]



36.    Exposure also occurs through the skin, which is the body's largest organ, subjecting it to absorption, even when the products are used carefully to avoid the eyes, nose, or mouth.[32]

37.    This is particularly disconcerting in the context of the Product since it constitutes a "leave-on product[], i.e., [it is] intended to stay on the skin all day, [and results in] a consequently greater exposure expected compared to other product types that are intended to be washed off immediately after application ('rinse-off

---

[29] *See* Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited Mar. 24, 2022).

[30] *Id.*

[31] Whitehead, et al., *Environ. Sci. Technol. Lett.*, at 538.

[32] Gary Swann, "The Skin is the Body's Largest Organ," 33 *J. of Visual Commc'n in Med.*, no. 4, 2010, at 148 (Dec. 2010), https://doi.org/10.3109/17453954.2010.525439.

products)."[33]

38.     That these substances are harmful to the human body is beyond dispute. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[34]

39.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[35]



[33] *See* Anna Brinch, et al., *Risk assessment of fluorinate substances in cosmetic products*, The Danish Env't Prot. Agency (Oct. 2018), https://www.2.mst.dk/Udgiv/publications/2018/10/978-87-93710-94-8.pdf (last accessed Mar. 24, 2022).

[34] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last accessed Mar. 22, 2022).

[35] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Mar. 22, 2022).

40.     The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[36]

41.     In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

42.     The harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[37]



43.     Once introduced, PFAS cause many of the same problems for other animals as they do for human, including harm to the immune system, kidney and liver function, of several animals from dolphins to sea otters to polar bears.[38]  PFAS pollute waterways and soil.  Often making their way to dinner tables of people who did not

---

[36] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 22, 2022).

[37] PFAS Free, What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Mar. 24, 2022).

[38] *Id.*

even purchase the Product.[39]

**C.    Defendants' Marketing and Sale of the Product Violates Federal Law**

44.    Section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, or cosmetics.  For the purposes of Section 12 of the FTCA, 15 U.S.C. § 52, the Product is a "cosmetic[] as defined in Section 15(e) of the FTCA.  15 U.S.C. § 55(e).  Under this provision, Defendants and other companies must have a reasonable basis for making objective product claims.

45.    The Federal Food, Drug, and Cosmetic Act ("FDCA") as well as subsequent regulations, which are fully incorporated into California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq*. and imposes identical requirements— prohibits "[t]he introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

46.    Defendants have represented that the ingredients in their Product are safe, natural, and sustainable, omitting and failing to warn of the PFAS in the Product. However, these representations are false, deceptive, and misleading as the Product actually contains dangerous levels of PFAS.  The making of such misrepresentations and omissions by Defendants constitutes a deceptive act or practice and the making of false advertisements in violation of Section 5(a) of 12 of the FTCA, 15 U.S.C. §§ 45(a) and 52(b).

47.    As alleged herein, Defendants have violated and continue to violate the FDCA and consumer protection statutes.

48.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendants' unlawful sale of the Product.  Indeed, no reasonable consumer, including Plaintiff, would have purchased the Product had they known they

---

[39] *Id.*

were adulterated and/or misbranded.

49.     Defendants engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from is omissions surrounding PFAS contamination in their Product.

**D.     Defendants' Misrepresentations and Omissions Are Actionable**

50.     Plaintiff and the Class were injured by the full purchase price of the Product because the Product is worthless, as it is marketed as safe and sustainable when it is not in fact safe and sustainable.

51.     Plaintiff and Class Members bargained for cosmetics products that are safe for use and sustainable, and were deprived of the basis of their bargain when Defendants sold them a product containing dangerous substances with well-known health and environmental consequences.

52.     No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to her health, safety, and wellbeing, or that it would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

53.      As the Product exposes consumers to PFAS that pose a risk to consumers' health, the Product is not fit for use by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendants' conduct, and injunctive relief.

54.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Product and to disclose that the Product contained substances known to have adverse health effects.  Nonetheless, Defendants concealed and affirmatively misrepresented the Product, as discussed herein.

55.    Although Defendants are in the best position to know what content they placed on their website and in marketing materials during the relevant timeframe, and the knowledge that Defendants had regarding the PFAS and their failure to disclose the existence of PFAS in the Product to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

56.    **WHO**:  Defendants made material misrepresentations and/or omissions of fact about the Product through their labeling, website representations, and marketing statements, which include the statements that the Product is safe and sustainable.  These representations constitute omitted material information regarding harmful chemicals in the Product.

57.    **WHAT**:  Defendants' conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product contains substances—PFAS— that are widely known to have significant health repercussions.  Thus, Defendants' conduct deceived Plaintiff and Class Members into believing that the Product is safe and sustainable, when it is not.  Defendants knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

58.    **WHEN**:  Defendants made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Product, despite their knowledge that the Product contained harmful substances.

59.    **WHERE**:  Defendants' marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

60.    **HOW**:  Defendants made material misrepresentations and/or failed to

disclose material facts regarding the Product, including the presence of PFAS.

61.   **WHY**:   Defendants made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Product, the effect of which was that Defendants profited by selling the Product to hundreds of thousands of consumers.

62.   **INJURY**:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendants' misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

63.   Defendants have had actual knowledge for years that the Product contains harmful chemicals such as PFAS.

64.   Although Defendants were aware of the deception in their labeling given the inclusion of PFAS in the Product despite claims of the Product's safety, they took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Product.

65.   Despite their knowledge, Defendants have fraudulently misrepresented the risks of the Product.  Defendants had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

66.   Defendants made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Product is safe and sustainable.

67.   Defendants concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product.  Defendants' concealment was knowing, and they intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendants' concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

68.     The PFAS included in the formulation, design and/or manufacture of the Product were not reasonably detectible to Plaintiff and Class Members.

69.     At all times, Defendants actively and intentionally concealed the existence of the PFAS and failed to inform Plaintiff or Class Members of the existence of the PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

70.     Defendants' statements, words, and acts were made for the purpose of suppressing the truth that the Product contained harmful chemicals.

71.     Defendants concealed or misrepresented the PFAS for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

72.     As a result of Defendants' active concealment of the PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from relying on any statute of limitations in light of their active concealment of the potentially harmful nature of the Product.

73.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained PFAS, which, at the very earliest, would have been January 2022.  Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS until after the Notre Dame study and Toxin Free USA's independent testing.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence of PFAS in the Product and of the Product's true nature.

## **CLASS ALLEGATIONS**

74.     Plaintiff brings this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Product (the "Class").

Excluded from the Class are persons who made such purchases for purposes of resale.

75.   Plaintiff also seeks to represent a subclass of all Class Members who purchased the Product in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale.

76.   As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

77.   At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given the nature of the claims and the number of retail stores in the United States selling Defendants' Product, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

78.   There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

(a)   whether Defendants misrepresented and/or failed to disclose material facts

concerning the Product;

(b)   whether Defendants' conduct was unfair and/or deceptive;

(c)   whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiff and the Class;

(d)   whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

79.   With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated the California

Consumers Legal Remedies Act as well as the California Unfair Competition Law.

80.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, purchased, in a typical consumer setting, Defendants' Product, and Plaintiff sustained damages from Defendants' wrongful conduct.

81.     Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.   The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

82.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.   Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
**(Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

83.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

84.     Plaintiff brings this claim individually and on behalf of the California

Subclass against Defendants.

85.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

86.    By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

87.    Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of their violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

88.    As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

89.    Plaintiff and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

90.    Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct

outweighs any alleged benefits attributable to such conduct.

91.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

92.   Defendants have further violated the UCL's proscription against engaging in **<u>Fraudulent Business Practices</u>**.  Defendants' claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

93.   Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

94.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

95.   Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Product they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

96.   The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

97.   Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of

violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

## <u>COUNT II</u>
### (Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)

98.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

99.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

100.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

101.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

102.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

103.    Defendants violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as safe and sustainable, when in fact the Product is not safe, dangerous, and useless.

104.    The Product is not safe because they contain an extraordinary level of PFAS that subject unsuspecting consumers to significant health risks.

105.    Defendants have exclusive knowledge of the Product's composition, which was not known to Plaintiff or California Subclass Members.

106.    Defendants made partial representations to Plaintiff and California Subclass Members, while suppressing the true nature of the Product.  Specifically, by

displaying the Product and describing the Product as safe and sustainable, including on the product packaging, on their website, and in their marketing, without disclosing that the Product was unsafe and detrimental to human health and the environment.  As described above, Defendants were in receipt of knowledge pertaining to PFAS in their Product and yet for a period of several years has continued to Product.  Moreover, Defendants affirmatively misrepresented the Product despite their knowledge that the Product was not as advertised.

107.   Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

108.   On January 31, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendants did not respond, did not make any changes to the Product, or pull the Product from the marketplace.

109.   Accordingly, Plaintiff and the California Subclass Members seek all relief available under the CLRA, including restitution, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## COUNT III
**(Breach of Implied Warranty Under the Song-Bervely Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

110.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

111.   Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

112.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

113.   California has codified the third-party beneficiary exception to any privity requirement.  Therefore, while ordinarily, Plaintiff might ordinarily be required to demonstrate vertical privity, she need not do so where, as here, she is a third-party beneficiary of Defendants' contracts with wholesalers or retail sellers and relied on Defendants' packaging in making her purchase.  Plaintiff and the California Subclass Members are third-party beneficiaries because the Product passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

114.   The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

115.   Plaintiff and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

116.   Defendants are in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

117.   Defendants impliedly warranted to retailer buyers that the Product was

merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendants breached these implied warranties because the Product was unsafe for use.  Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

118.  Plaintiff and California Subclass Members purchased the Product in reliance upon Defendants' skill and judgment in properly packaging and labeling the Product.

119.  The Product was not altered by Plaintiff or the California Subclass Members.

120.  The Product was defective at the time of sale when they it the exclusive control of Defendants.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

121.  Defendants knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

122.  As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

123.  Plaintiff and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### (Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.)

124.  Plaintiff realleges and reincorporates by reference all paragraphs alleged

above.

125.   Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

126.   Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendants misrepresented the Product as safe and sustainable when, in fact, the Product was not safe and not sustainable.

127.   By their actions, Defendants disseminated uniform advertising regarding the Product to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

128.   The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Product contains substances that pose a significant risk to the health and wellbeing of Plaintiff and the Subclass Members as well as to the environment.

129.   Defendants continued to misrepresent to consumers that the Product was safe and sustainable.  However, as described, this is not the case.

130.   In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class Members based their purchasing decisions on Defendants' omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to tens of millions of dollars. Plaintiff and Class Members were injured in fact and lost money and property as a result.

131.   The misrepresentations and non-disclosures by Defendants of the

material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

132.   As a result of Defendants' wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

133.   Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

134.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

135.   Plaintiff brings this claim individually and on behalf of the Class.

136.   At the time Plaintiff and Class Members purchased the Product, Defendants did not disclose, but instead concealed and misrepresented, the Product as "Safe For Use."

137.   Defendants affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use.

138.   Defendants also knew that their omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendants' representations (and corresponding omissions) in making purchasing decisions.

139.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

140.   Plaintiff and Class Members would have been reasonable in relying on

Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

141.   Plaintiff and Class Members had a right to reply upon Defendants' representations (and corresponding omissions) as Defendants maintained monopolistic control over knowledge of the true quality of the Product.

142.   Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

### COUNT VI
### (Constructive Fraud)

143.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

144.   Plaintiff brings this claim individually and on behalf of the Class.

145.   At the time Plaintiff and Class Members purchased the Product, Defendants did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

146.   Defendants affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use and otherwise sustainable.

147.   Defendants also knew that their omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon their representations (and corresponding omissions) in making purchasing decisions.

148.   Defendants had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and the Class Members relied upon Defendants to make full disclosures based upon the relationship between Plaintiff and Class

Members, who relied on Defendants' representations and omissions, and were reasonable in doing so, with the full knowledge of Defendants that it did and would have been reasonable in doing so.

149.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

150.   Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

151.   Plaintiff and Class Members had a right to rely upon Defendants' representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendants maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Product.

152.   Defendants breached their duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

153.   Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, and Defendants' breach of their duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

**COUNT VII**
**(Fraudulent Inducement)**

154.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

155.   Plaintiff brings this claim individually and on behalf of the Class.

156.   Defendants did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

157.   Defendants knew, or should have known, that the Product was falsely

portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

158.   Defendants also knew that their omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendants' representations (and corresponding omissions) in making purchasing decision.

159.   Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

160.   Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

161.   Plaintiff and Class Members had a right to rely on Defendants' representations (and corresponding omissions) as Defendants maintained a monopolistic control over the Product, and what information was available regarding the Product.

162.   Defendants intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Product based upon their affirmative representations and omissions.

163.   Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

164.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

165.   Plaintiff brings this claim individually and on behalf of the Class.

166.   As a result of the Plaintiff's and Class Members' purchase of the Product,

Defendants obtained money for their own use and benefit, and, as a result of their breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and Class Members in an amount to be determined at trial.

167. No part of any of the monies due and owing to Plaintiff and Class Members has been repaid, although Plaintiff and Class Members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

168. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

169. Plaintiff brings this claim individually and on behalf of the Class.

170. At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling the Product.

171. Defendants, acting through their representatives or agents, delivered the Product to their own distributors and various other distribution channels.

172. Defendants willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Product as discussed throughout.

173. Rather than inform consumers of the truth regarding the Product, Defendants misrepresented the quality of the Product as discussed herein at the time of purchase.

174. Defendants made these material misrepresentations to boost or maintain sales of the Product, and to falsely assure purchasers of the Product that Defendants are reputable companies and that their Product is safe for use and is otherwise sustainable. The false representations were material to consumers because the representations played a significant role in the value of the Product purchased.

175.   Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Product, as discussed throughout.   Plaintiff and Class Members had no way of knowing that Defendants' misrepresentations as to the Product, and had no way of knowing that Defendants' misrepresentations were misleading.

176.   Although Defendants had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

177.   Defendants misrepresented material facts partly to pad and protect their profits, as they saw that profits and sales of the Product were essential for their continued growth and to maintain and grow their reputation as a premier designer and vendor of the Product.   Such benefits came at the expense of Plaintiff and Class Members.

178.   Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.   Plaintiff's and class member's actions were justified given Defendants' misrepresentations.   Defendants were in the exclusive control of material facts, and such facts were not known to the public.

179.   Due to Defendants' misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Product that did not live up to their advertised representations.   Plaintiff and Class Members are entitled to recover full refunds for the Product they purchased due to Defendants' misrepresentations.

180.   Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.   Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future.

## COUNT X
### (Fraudulent Misrepresentation)

181.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

182.   Plaintiff brings this claim individually and on behalf of the Class.

183.   Defendants falsely represented to Plaintiff and the Class that the Product was safe for use and otherwise sustainable.

184.   Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Product.

185.   Defendants knew or should have known that their representations about the Product were false in that the Product is not safe for use as discussed throughout. Defendants knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

186.   Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment.   Given the deceptive manner in which Defendants advertised, marketed, represented, and otherwise promoted the Product, Plaintiff's and the Class' reliance on Defendants' misrepresentations was justifiable.

187.   As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known of the safety risks associated with the Product and that it does not conform to the Product's labels, packaging, advertising, and statements.

188.   Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XI
### (Negligent Misrepresentation)

189.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

190.   Plaintiff brings this claim individually and on behalf of the Class.

191.   Defendants had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

192.   Defendants breached their duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendants and by failing to promptly remove the Product from the marketplace or take other appropriate remedial action.

193.   Defendants knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants.  Specifically, Defendants knew or should have known that the Product was not safe for use and not sustainable.

194.   As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known that the Product was not safe for use and that the Product does not conform to the Product's labeling, packaging, advertising, and statements.

195.   Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XII
### (Quasi-Contract / Unjust Enrichment)

196.   Plaintiff realleges and reincorporates by reference all paragraphs alleged

above.

197.   Plaintiff brings this claim individually and on behalf of the Class.

198.   To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

199.   Plaintiff and Class Members conferred benefits on Defendants by purchasing the Product.

200.   Defendants were unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Product.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants failed to disclose that the Product was unfit for their intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

201.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## <u>COUNT XIII</u>
### (Breach of Express Warranty)

202.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

203.   Plaintiff brings this claim individually and on behalf of the Class.

204.   Plaintiff and Class Members formed a contract with Defendants at the time Plaintiff and Class Members purchased the Product.

205.   The terms of the contract include the promises and affirmations of fact made by Defendants on the Product packaging and through marketing and advertising, as described above.

206.   This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract

between Plaintiff and Class Members.

207.   As set forth above, Defendants purport through their advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use and is otherwise sustainable.

208.   Plaintiff and Class Members performed all conditions precedent to Defendants' liability under this contract when they purchased the Product.

209.   Defendants breached express warranties about the Product and their qualities because despite Defendants' warranties that the Product is safe for use and is otherwise sustainable the Product is objectively not in fact safe for use and not sustainable.   Thus, the Product did not confirm to Defendants' affirmations and promises described above.

210.   Plaintiff and each Class Member would not have purchased the Product had they known the true nature of the Product.

211.   As a result of Defendants' breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## <u>COUNT XIV</u>
### (Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.)

212.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

213.   Plaintiff brings this claim individually and on behalf of the Class.

214.   The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

215.   Plaintiff and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

216.   Defendants are suppliers and warrantors as defined in 15 U.S.C § 2301(4)

and (5).

217.  In connection with the marketing and sale of the Product, Defendants impliedly warranted that the Product was fit for use and expressly warranted that the Product was safe and sustainable.  However, as described throughout, neither is true.

218.  By reason of Defendants' breach of warranties, Defendants violated the statutory rights due to Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C §§ 2301, *et seq.*, thereby damaging Plaintiff and the Class.

219.  On January 31, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a pre-suit notice letter, apprising Defendants of their breach of warranties.  The letter was sent via certified mail, return receipt requested.  The letter stated that it was sent on behalf of all other similarly situated purchasers. Defendants did not response, did not make any changes to the Product, and did not pull the Product from the marketplace.

220.  Plaintiff and Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Product if they knew the truth about the Product.

## COUNT XV
### (Negligent Failure to Warn)

221.  Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

222.  Plaintiff brings this claim individually and on behalf of the Class.

223.  At all relevant times, Defendants were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product.  At all relevant times, it was reasonably foreseeable by Defendants that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

224.   At all relevant times, Defendants knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

225.   Defendants as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Product.

226.   At minimum, the duty arose for Defendants to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

227.   Defendants were negligent and breached their duty of care by negligently failing to provide warnings to purchasers and users of the Product, including Plaintiff and the Class, regarding the true nature of the Product, its risks, and potential dangers.

228.   Defendants were negligent and breached their duty of care by concealing the risks of and failing to warn consumers that the Product contains ingredients known to cause adverse health effects in humans.

229.   Defendants knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Product as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks.  Defendants failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

230.   As a direct and proximate result of Defendants' failure to adequately warn consumers that the use of the Product, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.  Plaintiffs also request medical monitoring as a means to safeguard their health and mitigate any damages for future medical treatment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.  For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the California Subclass and Plaintiff's attorneys as Class Counsel;

B.  For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.  For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

D.  For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.  For prejudgment interest on all amounts awarded;

F.  For an order of restitution and all other forms of equitable monetary relief;

G.  For injunctive relief as pleaded or as the Court may deem proper;

H.  For medical monitoring as a means to safeguard Plaintiff's and Class Members health and to mitigate any damages for future medical treatment; and

I.  For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  March 25, 2022

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: ___/s/ L. Timothy Fisher_____

L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
           slitteral@bursor.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

40

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Yeraldinne Solis.  Plaintiff Solis resides in Escondido, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California, as Plaintiff purchased the Products from brick-and-mortar retails stores located within this District. Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 25th day of March, 2022.

*/s/ L. Timothy Fisher*
L. Timothy Fisher
